## RAVARE et al. v. McCORMICK & CO. et al.
### No. 5199.

Court of Appeal of Louisiana.
Second Circuit.
March 2, 1936.

Overton & McSween, of Alexandria, for appellant.

C. E. Laborde, Jr., and Earl Edwards, both of Marksville, for appellee.

DREW, Judge.

The lower court, in a well-written opinion, has correctly stated the issues involved in this case. They are as follows:

"This suit was instituted by Louis Ravare, Stella Juneau Ravare, his wife, and Gulfrey Clayton against McCormick & Co., Inc., and Eldren J. Lacombe, carrier and deliverer of the 'Alexandria Daily Town Talk,' a newspaper owned and operated by McCormick & Co., to recover damages in the aggregate sum of $2,500, with legal interest thereon from judicial demand until paid, for injuries alleged to have been sustained by them growing out of a collision occurring on December 1, 1934, between an automobile driven by Lacombe and a two-horse wagon in which plaintiffs were riding.

"Plaintiff, Stella Juneau Ravare, seeks to recover $1,760; $1,000 for pain and suffering, and $760 as a result of being deprived of the use of her arm, and for a drooping left shoulder.

"Plaintiff, Louis Ravare, claims damages in the sum of $640, itemized as follows:

(a) Contusions of the lumbar regions and arm, together with a mild degree of surgical shock, resulting in pain and suffering, and damaging him in the amount of .. $150.00
(b) Destruction of his wagon ... 40.00
(c) Doctors' bills for himself and wife ...................... 250.00
(d) Loss of services of his wife, by reason of her injuries making her practically helpless .......... 120.00
(e) Trouble and expense in obtaining medicines ...:.......... 30.00
(f) X-ray picture of wife ...... 50.00

"Plaintiff, Gulfrey Clayton, alleges damages in the sum of $100; $90.00 for shock, pain, and suffering, and $10 for medical services.

"At the time of the collision, Lacombe was engaged in delivering the Alexandria Daily Town Talk, and McCormick & Co. is joined in the suit on the ground that Lacombe was the agent and employee of the company, acting in the scope of his employment, and, as such, the said company is responsible for his negligence and torts.

"The defendants in their answer deny the negligence of Lacombe and allege the plaintiffs' own negligence. McCormick & Co. further deny liability on the ground that Lacombe at the time of the collision was an independent contractor, and not its agent and employee, and that it is not liable for his torts."

On these issues the lower court rendered judgment for plaintiffs against both defendants, in solido, and from which judgment only McCormick & Co. has appealed.

It correctly found the facts as to the collision to be as follows, and correctly applied the law to its finding of fact:

"Lacombe, while delivering the Alexandria Daily Town Talk, a daily publication owned and operated by McCormick & Co., on December 1, 1934, collided or ran into the rear of a wagon in which the plaintiffs were riding, at a point about one mile north of Marksville, on the Marksville-Alexandria paved highway. There is conflicting evidence as to the time of the day, but the preponderance of the evidence fixes the time at between sunset and dark, or in the neighborhood of 5:10 p. m. The court further finds that the wagon was being driven by Ravare well on the right-hand side of the road, with the two right wheels and one mule off the paved slab and on the shoulder. A car had just met the wagon coming from the opposite direction when Lacombe's auto struck the rear of the wagon and then being forced to choose between the wagon and the auto, or that his auto had faulty brakes and he did not see the wagon in time to stop his car and avoid the collision. It was testified by Lacombe and his companion that it was dark and that they had their lights on; further, that though their lights were good, he (Lacombe) did not see the wagon until they were about ten feet from same, and it was so far on the left-hand side of the road he had to hit it. As stated before, the court finds the evidence otherwise. The on-coming car could not have passed had plaintiffs been on the left of the highway; further, that all the plaintiffs, a bystander, Albert Clayton, and Alfred Laborde, who picked plaintiffs up, stated it was not dark and that cars did not have their lights on. It seems too that plaintiffs had a lantern on their wagon for use as a taillight after dark, and they had not yet seen fit to light same. In passing, however, the court might state that even if the testimony of Lacombe and Beauregard, Lacombe's companion, is correct, he certainly must have had very defective lights or was very inattentive and not keeping a proper lookout in front of him, and he was guilty

of actionable negligence in so striking plaintiffs from the rear. The plaintiffs' evidence, which by far preponderates, makes a still stronger case against him because he was grossly negligent in not avoiding the collision when he could see, or should have seen, since the time of the collision is fixed before dark, all that was before him, and still did not stop.

"The court finds the 'Law of the Road' to be that one who attempts to pass a vehicle on the road is called upon to exercise an extraordinary degree of care, and does the passing at his risk. Louisiana Highway Regulatory Act No. 21 of 1932, § 3, rule 7; Stevens v. Dean, 6 La. App. 537; Uzzo v. Torres, 3 La.App. 292; Jeter v. Caddo Transfer & Warehouse Co., 1 La.App. 35.

"It is the conclusion of the court, therefore, that Lacombe was negligent and that his negligence was actionable."

Defendants pleaded contributory negligence on the part of plaintiffs, but under the above-stated facts, as disclosed by the record, failed to prove same. There was no negligence on the part of plaintiffs.

On the question of independent contractor, the principal defense relied on by appellants here, the lower court again correctly found the facts as to the relation of Lacombe to the appellant, McCormick & Co., Incorporated, and we are convinced correctly applied the law applicable to the facts found. It said:

"Now to discuss the relation of McCormick & Co. in the case:

"It is an uncontroverted fact that Lacombe, at the time of the collision, was on his route and engaged in the delivery of the Alexandria Daily Town Talk. There remains for consideration, therefore, the relation between Lacombe and the company, or whether Lacombe is the agent and employee of the company or an independent contractor. If the former, the company is liable for his torts; if the latter, it is not.

"What is an independent contractor? It is defined as 'one who is rendering services, an independent employment or occupation, and represents the employer only as to the results of his work, and not as to the means whereby it is to be done.' 39 C.J. § 1517, p. 1315. The most generally applied test of the relationship is the 'right of control as to the mode of doing the work contracted for.' Ibid. § 1316; Faren v. Sellers, 39 La.Ann. 1011, 3 So. 363, 4 Am.

St.Rep. 256; Gallagher v. Southwestern Exposition Ass'n, 28 La.Ann. 943.

"The circumstances which go to show one to be an independent contractor are the 'independent nature of his business, the existence of a contract for the performance of a specified piece of work, the agreement to pay a fixed price for the work, the employment of assistants by the employee who are under his control, the furnishing by him of the necessary materials and his right to control the work while it is in progress.' 39 C.J. p. 1316, § 1517. It thus appears that the right of control or supervision by McCormick over Lacombe, together with other surrounding facts, should be considered. This right is denied by both Lacombe and the circulation manager of the company, Mr. J. E. Richardson. Proof of actual control and supervision necessarily infers the existence of the right to do so. Further, there is no written contract between Lacombe and the company to show their relationship. The facts will necessarily play the determining role.

"Before stating its conclusion on this point, the court wishes to state and discuss the facts considered in arriving at it. As previously stated, the right to supervise and control Lacombe's employment by the company is the primary test of the relationship here. Since there is no written contract, the facts showing control and supervision are evidence of the right to do so, whether same be admitted or denied. On this point practically the only evidence adduced on the trial was that of Eldren J. Lacombe, the carrier, and J. E. Richardson, circulation manager for the company.

"It was testified by Lacombe on cross-examination at the beginning of the case that he worked on a commission basis; that at the time of the collision, he was paid, in addition to his commission, a certain weekly amount of about $10, stating that he took that from the money he took in, paying his expenses out of it and getting his commission therefrom too. On direct examination, Lacombe stated he furnished all his expenses. This evidence came after the trial was well under way and after the testimony above. He stated on direct examination, however, that he did not get enough out of his route in commissions to justify his time and expense, and he was paid an additional sum for 'advertisement.' Again, on recross-examination, Lacombe stated that the sum was to help as advertisement, or to advertise and get the route

established. It was stated again by him that it was to help pay expenses, to advertise, and get the Daily Town Talk among the people. Such was the relation as to the pay Lacombe was receiving at the time of the collision, and which ceased in January and February, 1935, after which it is alleged he received only his commission of 4 cents per paper per week. The court is of the opinion that this sum, in addition to the commission he received, for all practical intents and purposes was a wage or salary used by Lacombe to defray his expenses on his route, and for such other purposes he saw fit.

"Now to discuss the matter of who furnished Lacombe with a means of transportation in making his route. It was alleged in defendants' answer that the auto belonged to Lacombe, and he paid all the expenses incidental to the operation of same. The court wishes to state at this time that the car used by Lacombe at the time of the trial was a different one from that used by him when the collision happened. However, on the trial he claimed ownership of the auto, the one presently used by him, just as was claimed in his answer as to the one he drove at the time of the collision. He testified on cross-examination that he had purchased it personally from the Super Service Station, actually paid the money, but stated Mr. J. E. Richardson, circulation manager of the company, had 'stood good' for it. It further developed that Lacombe's own application for a license on the car gave the company's circulation manager as owner. On cross-examination, he denied that Mr. Richardson purchased the car. Still on direct examination, he stated Mr. Richardson purchased the car instead of himself from the Service Station, and he in turn bought it of the circulation manager of the company. When recrossed on this point, it finally turned out he was buying it or had bought it from both Richardson and the Service Station. Mr. Richardson, himself, when examined on this point, stated he had purchased the car in his name for Lacombe; that he had furnished the money to buy the license; and that was the reason Lacombe had bought it in J. E. Richardson's name. It is the court's conclusion here that the testimony adduced in this connection is almost wholly irreconcilable, but satisfies it that the car was purchased by the company or by Mr. Richardson, its circulation manager. It was purchased for Lacombe's use on his route and even the license was purchased by the circulation manager of the company. While this is a different car from the one used at the time of the collision, it was asserted under oath in regard to this one that it belonged to Lacombe in just the same manner. There is no evidence adduced on either side on the car used at the time of the collision and it seems to have dropped out of the picture. However, there is no evidence showing any change of relationship between the parties at the time of this trial and at the time of the collision, the presumption being it was the same, and the court feels justified in concluding the ownership of the car used in the delivery of the Town Talk by Lacombe at the time of the collision vested in the circulation manager of the company. Further, since a corporation can act only through its agents and employees, Richardson's purchase and ownership, since it was done to promote the interests of the company, was the company's act. The court is satisfied, after a full consideration of all the evidence on this point, that the car used and operated by Lacombe in the delivery of the company's publication, and which was involved in the collision, was the company's automobile and not the carrier's car, as alleged.

"Now, to discuss facts along another angle of the case, or on the control and supervision of the company over Lacombe. This job was to deliver the company's publication over a 100-mile route, and through three towns. The carrier had customers all along this route, and, in addition, a wholesale agent in one of the towns. The very nature of the employment involved here made it impractical and impossible for the company to control or supervise the carrier's acts after he left the company's quarters. It appears the company is very directly concerned and keeps a close supervision and control on the route. The company kept a board listing all the customers and agents on Lacombe's route; checks were receivable by Lacombe or the company, and cash likewise. A new customer could make arrangements by Lacombe or through the company; printed form notices were provided Lacombe by the company to notify customers as to the expiration dates on their subscriptions. The papers were not bundled or addressed, except in one instance (Mrs. Medici), to whom a bundle of papers was delivered for the town of Marksville. It was stated that Mrs. Medici was an agency on the route; that she was responsible to Lacombe and

the company; and, further, that she paid the company for the papers directly through the mail, and not as a subagent or subemployee of Lacombe and to him. It is further noted that various instructions or data were put on this board by the company for Lacombe's benefit; and that he usually reported to the circulation manager before going on his route, 'not to. get instructions,' as stated, but to turn in his money, or the money he collected. This is a. fact admitted by him, very inconsistent with an independent contractor relationship. If Lacombe was responsible only for the price ·of the paper which he bought and sold as his wares or merchandise, the money collected was his and there was no reason why he should turn it in to the company. The logical thing to do, if such were the case, would be a weekly or monthly settlement with Lacombe paying for the papers he bought from the company. The route was a new one; it was Lacombe's business to go around and build the circulation, get new customers, 'advertise the paper,' and, in short, work for and promote the interests of the company in building the circulation of its publication. The circulation manager and the attorney for defendants refer to Lacombe in the testimony as the 'agent or carrier'; the circulation manager stated they expected him to gain circulation, deliver his papers within a reasonable time; that he had some 'supervision' over Lacombe, consulted with him and expected Lacombe to consult with him; that the papers had to be put out in his territory; and, further, that if Lacombe were paid a salary, he would have control over him. Again, it was testified, a customer subscriber could look to the Town Talk or company for the delivery of the paper which they were glad to deliver; and, further, he, Richardson, could cancel the agreement with Lacombe and put a new man on the route, and that they had sufficient data and records to do this. The court saw fit to discuss many little facts to elicit or make clearer the true relationship between Lacombe and the company.

"The general· test in arriving at whether Lacombe is an independent contractor or not has already been given, and, that being so, the facts in each particular case must determine the control and supervision and true relationship. Control and supervision on the part of the company are categorically denied by both Lacombe and Mr. Richardson. The testimony and facts above discussed, however, show, in the opinion of the court, positive control and supervision and to as great an extent as is practically possible in an employment of this nature. Further, as hereinabove stated, in addition to the control and supervision, the automobile was company owned; the expenses were paid at least in part by the company; Lacombe was paid a wage or salary in addition to his commissions; and he worked directly for and to promote the interests of the company in 'advertising same'; all of which facts show a relationship truly inconsistent with the contention that Lacombe is an independent contractor. The conclusion of the court, therefore, is that Lacombe was not an independent contractor and was the agent and employee of McCormick & Co., and that therefore it is liable to damages for Lacombe's torts committed in the exercise of his employment.

"The court may well quote here the language in the case of Johnson v. Mayer, 30 La.Ann. 1203: 'These are small and apparently trifling circumstances, when weighed against the high-sounding periods of an authentic act. But straws are better indicators of the course of the wind than are the marble columns of some imposing temple. * * * "Trifles light as air" may become "confirmations strong as proofs of Holy Writ." '

"The question here presented for determination is not a novel one in the jurisprudence of the state. The case of Abate v. Hirdes et al., 9 La.App. 688, 121 So. 775, presented the identical issue here involved, but under a state of facts already distinguished from those presented in the case at bar. In that case, Hirdes, who owned the truck, was engaged in delivering newspapers of the Item Company, Limited, and was paid a weekly salary or allowance for his services. Both Hirdes and the Item Company were made defendants, and the court ruled that Hirdes was nothing more than a distributor, acting independently, purchasing his wares from the manufacturer and selling them to his customers. The case was decided in 1928, one of the judges dissenting.

"The facts in the case at bar, however, can be readily distinguished from those in the above case. It appears that this was an established route. What Hirdes received was not strictly a salary, for he was a man of ability and the company paid him a certain amount as a gratuitous addition to his earnings; that it was impossible for him

to make a satisfactory living without this and they needed such a man as this one. In this case, it was a new route; Lacombe was paid an additional sum to his earnings, not as a gratuity, but as a stipend to help him defray his expenses, advertise the Town Talk, and promote the circulation of the paper and the general interests of the company. It was an unquestioned fact in the case cited that Hirdes owned the truck and paid all his expenses in connection with same. In the case at bar, it was testified that money was paid to help defray the expenses; that the company, through J. E. Richardson, paid for the license and actually owned the automobile, though it was denied. Last and most important in the case cited, the Item Company did not have the right and did not supervise or control Hirdes. The contract and the testimony clearly established this fact. In this case, the evidence reveals a different relation. Lacombe was controlled and supervised by written directions, consultations, advices, the keeping data for him, reporting to the company periodically, checking up and turning in money, taking new subscriptions, and in the manner he was paid. It therefore appears that this authority is not wholly applicable to the facts in the case under consideration.

"In the case of Turner v. Item Company, 6 La.App. 270, the plaintiff joined one Curtis Berlin and the Item Company as defendants, in the parish of Rapides. An exception to the jurisdiction of the court was filed in behalf of the company on the ground that the former was not the company's agent. The evidence showed that the company and Harry Fox had a contract, Fox to get such copies of the papers as he should order, at a stipulated price. Fox in turn hired Curtis Berlin to transport the papers in a truck from the station to the news stands. The court said there was nothing to show Berlin was the agent of the defendant company, and since it was Berlin's conduct that caused the injury, the company was not liable.

"In the case at bar, Lacombe himself caused the injury, not an employee of Lacombe entirely unknown to defendant company. Lacombe was hired, paid, and controlled by the company direct. Another significant fact in this case is this: Independent contractors usually employ subcontractors to help complete their jobs or perform their tasks. On Lacombe's route, we find one subdeliverer of the Town Talk,

Mrs. Medici, in Marksville. The testimony reveals that Mrs. Medici was not paid by Lacombe, nor did she pay Lacombe for her papers. She settled directly with McCormick & Co., and there paid for her papers. Why did she not report and settle with Lacombe who brought them to her? If he was an independent contractor as contended, she should have known him, only, and checked in with him. The reverse remains; she settled with the company direct, usually mailing the checks to the company herself, and not to Lacombe. This was testified to by both Lacombe and J. E. Richardson, circulation manager of the defendant company; further, the company accepted and indorsed a check payable to it, bearing the legend, 'Subscription —Lacombe—carrier-agent.'

"In Marquez v. Le Blanc et al. (La.App.) 143 So. 108, a suit was instituted against Le Blanc and the State Agriculture Credit Corporation. The company contended that Le Blanc was an independent contractor for whose negligent act it was not responsible. The opinion consists of a discussion of many authorities and concludes that the car was owned by Le Blanc; that his duties consisted in examining crops and making written reports to the company every two weeks; that he had no definite hours and was in no way supervised or controlled by the company. In that case Le Blanc was held to be an independent contractor. Again, however, the court finds the true facts in the case at bar, as above discussed, to be clearly distinguished from those here presented. The common-law authorities discussed in that case, and here cited by defendants, are based on different facts from those presented before the court.

"The cases of Shea v. Reems, 36 La.Ann. 966 and Jones v. Shehee Ford Wagon & Harness Company (La.App.) 157 So. 309, are also Louisiana authorities passing on the issue here presented. The latter case cited was decided on November 2, 1934, a very late case on the question, and which reviews the jurisprudence in detail. The Jones Case presents a state of facts very similar to the one at bar, reviews the Reems Case and the jurisprudence very thoroughly. In this case the president of the company testified that it owned the car driven by Tarpley and paid his expenses. In the case at bar, ownership of the car is denied, but the evidence established it. Tarpley had a route which he traveled each week, went where he wanted to, knew

his territory, did not report for daily instructions, and, in short, reports to the company were very seldom made. The company had no control over where he was going on any particular day or at any time; did not supervise the work; paid him a salary and some expense money. His route could be changed. In the case at bar, the expense money was established; the commission salary was established; ownership of the automobile on the part of the company was established; and so was substantial control and supervision over Lacombe. In this case, as in that one, employee relationship was denied, and in both the collision occurred while in the course of employment. The power to change Lacombe's route was admitted in the case at bar by Richardson, who added, 'if Lacombe wanted to.' That in actual practice adds but little. If Lacombe would not want to just as any other employee, it would mean dismissal from employment. The court held the defendant company liable after reviewing the whole jurisprudence, and this court feels that the facts in the case at bar are stronger than in the Jones Case.

"A case very similar to the one before this court for decision was presented to the Supreme Court of Louisiana in Shea v. Reems, supra. The court said:

" 'The evidence leaves no doubt that Rickert was employed by defendant, Reems, to peddle goods for the latter at a fixed wage of six dollars per week, with an additional compensation of two per cent. on the price of all goods sold, and with the privilege of keeping any excess of price for which he sold the goods, over and above the prices limited by Reems.

" 'Under the textual provisions of the Code this contract established the relation of master and servant. Servants, says the Code, are those—"who let, hire or engage their services to another in this State, to be employed therein at any work, commerce or occupation for the benefit of him who has contracted with them, for a certain price or retribution, or upon certain conditions." Art. 163.

" ' "There are three kinds of servants, viz.:

" ' "1. Those who hire out their services by the day, week, month or year, in consideration of certain wages;

" ' "2. Those who engage to serve for a fixed time, etc.;

" ' "3. Apprentice, etc." Art. 163.

" 'Rickert clearly belonged to the first class of servants, and Reems bore to him the correlative relation of master.

" 'There seems little need to refer to common law authorities on the subject, but, were we to do so, they would afford defendant no relief. In that system the test of the relation of master and servant is found in the question whether one person has placed himself under the direction and control of another in such manner as to confer upon the latter the power of discharge for disobedience. Cooley on Torts, p. 532; 2d Thompson on Neg., p. 892, and authorities cited.

" 'Our Code ordinarily infers such power of control and discharge from the payment of wages. We find the same rule to prevail at common law, where, in discussing the distinction between servants and independent contractors, it is thus stated by Mr. Thompson:

" ' "Perhaps the most usual test by which to determine whether the person doing the injury was a servant or independent contractor, is to consider whether he was working by the job or at stated wages—so much per day, week or month. A person who works for wages * * * is a servant, and the master must answer for the wrongs done by him in the course of his employment." Thompson on Neg., p. 912, § 39.

" 'And, indeed, it would be difficult to imagine one person's binding himself to pay a fixed compensation weekly for the service of another, if the latter were to be emancipated from the former's direction and control and left free to perform the service or not at his whim, or to perform it in a manner opposed to the employer's will and, perhaps, yielding him no benefit. If the term of employment had been for one year and at a fixed annual compensation, the incongruity of such a construction would be more striking; but the principle is identical.

" 'The attempt to pervert the relation between Reems and Rickert into a mere bailment to sell goods upon commission like the relation between a cotton factory and his shipper, is entirely negatived by the contract for wages, which placed Rickert's time and labor at the exclusive service and control of Reems within the scope of the employment.'

"The case of Goff v. Sinclair Refining Company (La.App.) 162 So. 452, presents

a factual set up somewhat similar to the one at bar. In this case, the oil company's distributing agent was joined in a damage suit with the company. An exception was filed in behalf of the company, setting up the defense with a lengthy written contract tending to show that this agent was an independent contractor for whose torts the company was not liable. The court refused to sustain the exception of no cause of action filed by the company, stating the contract showed an agency or employee relationship, and ruled the company into court. The contract was a lengthy one setting forth that the relation was that of independent contractor, but the court held the company was properly made a party defendant to the suit."

We likewise find no manifest error in the awards made to the different plaintiffs, on which subject the lower court had the following to say:

"There remains now for the discussion and consideration of the court the question of damage to be awarded petitioners. The court finds on the evidence adduced on trial that Louis Ravare's claim should be reduced to $420. The sum of $150 seems to be ample for the doctor's bills for him and his wife; the trouble and expense item is excessive by $20, and his loss of the services of his wife, by $100. The court finds that he had a grown daughter to take care of and do the housework around his place. The other items of damage are well founded and are not disturbed.

"The claim of Gulfrey Clayton seems to be just and reasonable, and will not be disturbed.

"The amount claimed by Stella Juneau Ravare is also somewhat excessive. The court feels justified in reducing the claim for the drooping shoulder and disability to $580, and the claim for her pain and suffering to $800, or a total to her in the sum of $1,380.

"The court finds as a fact that the parties plaintiff were severely injured as a result of this collision; that Stella Juneau Ravare suffered a multiple fracture of the collar bone, was confined to her bed for three weeks or better, suffered contusions about the body, arms, and face, and suffered a great deal of pain as a result; moreover, she seemed to have a physical deformity by way of a drooping shoulder, and to the date of the trial was unable to use her arm in any practical uses.

"The injuries of the other two plaintiffs are less severe in comparison, but fully justify the awards above given, subject to the deductions made by the court.

"The amounts here awarded are in line with the jurisprudence of the state of Louisiana, as discussed in the cases of Thompson v. Commercial Nat. Bank, 156 La. 479, 100 So. 688; Russell v. Shreveport Belt Ry. Co., 50 La.Ann. 501, 23 So. 466; Landix v. New Orleans Ry. & Light Co., 140 La. 529, 73 So. 668; Baucum v. Pine Woods Lbr. Co., 130 La. 39, 57 So. 577, and Cartwright v. Puissigur, 125 La. 700, 51 So. 692.

"It is therefore ordered that there be judgment herein in favor of plaintiffs and against defendants, in solido, in accordance with the opinion of this court, together with interest at the rate of 5 per cent. per annum from judicial demand until paid, and for all costs of this proceedings.

"C. R. Bordelon, District Judge."

In our opinion, the judgment of the lower court is correct, and it is therefore affirmed, with costs.